PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* BENITO CARRIL, Defendant and Appellant.

No. 3960. Argued January 16, 1930.—Decided June 27, 1930.

*José Carbia Miranda* for appellant.   *R. A. Gómez* for appellee.

Mʀ. Jᴜsᴛɪᴄᴇ Wᴏʟꜰ delivered the opinion of the Court.

In the Municipal Court of San Juan the defendant and appellant, Benito Carril, a druggist, was charged with the crime of violation of section 1 of Rule 53.  The complaint contained no specification of what the body of rules was and went on to recite that the offense was committed as follows: That on the 17th of July, 1928, in Santurce at the corner of Loíza and Carrión streets in the Municipal District of San Juan, Benito Carril, who is a druggist, with a drug store open to the public in Santurce, etc., exposed for sale gelatinous capsules in a vial labelled capsules of castor oil of 2-½ grams; that of such capsules he sold to the Rabainne family of Santurce four capsules as castor oil, which a member of that family took and after a short time experienced symptoms of poisoning and was attended by Doctors M. Pujadas Díaz and Víctor Gutiérrez Ortiz; that Carlos del Rosario, a registered pharmacist, Chief of the Food and Drug Bureau of the Insular Department of Health, seized said vial labelled capsules of castor oil which, when examined by the Insular Chemical Laboratory, turned out to be tetrachloride of carbon and not castor oil as was expressed on the label taken from Mr. Carril at his pharmacy in Santurce; that these facts are against the law, being an infraction of section 1 of Rule 53 of May 10, 1917 (of what body not expressed).  The defendant was convicted in the municipal court and similarly on appeal in the district court.

When the case was brought up for discussion in this court the question arose whether a druggist who in good faith sells drugs falsely labelled, not by himself but by others,

could be charged with crime, and whether a duty could be placed upon a druggist not to sell any drug unless it turned out to be as marked. We shall take judicial notice of the fact that druggists customarily receive from manufacturing chemists all sorts of standard drugs and medicines. The problem was presented whether a druggist before selling it could be required to test every drug received by him from such manufacturing chemists. An incidental problem also arose whether the police power could extend so as to make a druggist criminally responsible unless a criminal intent was shown. Under these circumstances, it becomes necessary to examine how and when and with what authority the alleged crime was defined by the laws of Puerto Rico.

The appellant is charged with the violation of section 1 of Rule 53. This turns out to be a regulation of the Department of Health promulgated by Governor Yager on the 10th of May, 1917, and prescribes as follows:

"No person, syndicate, corporation or institution of whatever character it may be, shall sell, offer, expose or hold for sale or transport or store, any food or drug whatever, for consumption in the Island of Porto Rico, if it be adulterated or misbranded, within the meaning of these terms as defined in this Regulation, which is the same as that expressed in Arts. 7 and 8 of the Food and Drug Act, approved by the Congress of the United States on June 30, 1906."

The proclamation purports to be made by virtue of Act No. 81 of March 14, 1912. The pertinent parts of that act are:

"Section 12. That it shall be the duty of the Insular Board of Health to act as an advisory and legislative body in respect to all matters pertaining to the public health, and it shall prescribe all sanitary rules, regulations and ordinances required by this Act, which shall govern in all the municipalities of Porto Rico, with a view to preventing and suppressing contagious and epidemic diseases, destroying the vehicles of propagation of malarial fevers and tuberculosis and other transmissible diseases, and dealing with any other service affecting public health, such as the water service, food and beverages, construction of buildings within the towns, ventilation, drainage, and

sanitary plumbing installations, hotels, inns, boarding houses, sleeping houses, cafés, restaurants, eating houses, canteens, tenement houses, private dwellings, houses in general, schools, factories and workshops, dangerous, unhealthy or uncomfortable industrial establishments, slaughterhouses and slaughtering markets, meat markets, garbage, transportation of garbage and organic fertilizers, cleaning of cesspools and sinks, public ways, railroads, street railways, hospitals, *maisons de santé*, sanatoriums, animals and cattle, rural sanitation and hygiene, transmissible diseases, corpses, cemeteries, interments and disinterments, autopsies, embalmings, transportation of corpses, barber and hairdressing shops and public bath pavilions, dairies and milk depots.

"It shall be the duty of the Insular Board of Health to prescribe rules and regulations for governing conditions surrounding employees of the Government or of private parties, in so far as such regulation is necessary in the interest of public health, and of conditions to be maintained in dairies and bakeries, and in connection with the slaughter of animals for food, and governing the transportation of milk and other dairy products, bread and other bakery products, and meat and meat products; for the disposal of garbage and refuse of all kinds: *Provided,* That nothing in this section shall authorize the issuance of regulations that will deprive a member of the female sex of the privilege of selecting the physician who is to make examinations as to her physical condition. It shall define the class of sanitary appliances to be installed and maintained in public and private buildings, and prescribe rules and regulations for the burial, exhumation and transportation of cadavers, and the regulation to be observed in respect to reporting, isolating and treating infectious or contagious diseases, and guarding from contamination all streams from which water for drinking or domestic purposes is taken.

"Section 13. That the Director of Sanitation shall submit to the Executive Council, for the consideration and approval, all rules and regulations prescribed by the Insular Board of Health, endorsing thereon his views. The Executive Council may amend or alter such rules and regulations and return same to the Director of Sanitation for reconsideration by the Insular Board of Health. If differences finally exist between the Executive Council and the Insular Board of Health as to the rules and regulations which shall be put into effect, a conference committee shall be appointed by the presidents of both bodies, to consist of three members from the Insular Board of Health and three members from the Executive Council: *Provided,*

That in case of disagreement or tie vote the Governor of Porto Rico shall designate one of the Justices of the Supreme Court who shall for the time being become a member of the Board for the purpose of deciding the questions at issue. The conclusions of a majority of the committee so appointed shall rule and be accepted by the Insular Board of Health and the Executive Council as controlling and conclusive. All such rules and regulations, when approved by the Executive Council, shall be promulgated by the Governor of Porto Rico and shall be published in two newspapers of general circulation in the Island and thereupon and thereafter shall have the force and effect of law.

"Section 33. That any person violating any sanitary regulation put in force as herein provided shall be punished by a fine of not less than one nor more than one hundred dollars, or by imprisonment from one to thirty days, or with both penalties, at the discretion of the court."

Thus the offense charged in this complaint has been defined by no general law of the Legislature and depends, if it exists at all, upon the rule-making power of the Department of Health.

Section 335 of the Penal Code provides:

"Every apothecary, druggist, or person carrying on business as a dealer in drugs or medicines or person employed as clerk or salesman by such person, who, in putting up any drugs or medicines, or making up any prescription, or filling any order for drugs or medicines, wilfully, negligently, or ignorantly omits to label the same, or puts an untrue label, stamp, or other designation of contents, upon any box, bottle, or other package containing any drugs or medicines, or substitutes a different article for any article prescribed or ordered, or puts up a greater or less quantity of any article than that prescribed or ordered, or otherwise deviates from the terms of the prescription or order which he undertakes to follow, in consequence of which human life or health is endangered, is guilty of a misdemeanor, or if death ensues, is guilty of a felony."

This section defines the duties of a pharmacist, the violation of which would subject him to a public prosecution. Unless with the clear consent of the Legislature, no rule-making body can add to or subtract from the duties so defined. The Legislature has spoken.

Supposing, however, that section 335 did not cover the whole field, then we hold that the power to define the crime here sought to be punished could not and was not delegated to a rule-making body.

We have seen that section 13 of Act No. 81, *supra,* says that the rule promulgated shall have the force of law. *Caha* v. *United States,* 152 U. S. 211, 218, is the leading authority for the extent of departmental rules, and *United States* v. *Eaton,* 144 U. S. 677, 688, was distinguished. There is nothing, however, in the *Caha* case that changed the fundamental rules laid down in *United States* v. *Eaton, supra.* There it was held that it was necessary that a sufficient statutory authority should exist for declaring any act or omission a criminal offense. In *United States* v. *Grimaud,* 220 U. S. 506, 520, it was held that while it was difficult to define the line which separated legislative power to make laws and administrative authority to make regulations, Congress may delegate power to fill up details where it has indicated its will in the statute. Certain rules do not become legislation it was held, because violations thereof are punished as public offenses. What is so delegated to a rule-making body must be in the nature of non-legislative powers.

This jurisprudence has been more or less reviewed by this court. Perhaps the most pertinent case is *People* v. *Ortiz,* 29 P.R.R. 395. There we said (p. 398):

"Of course, 'the power conferred to make regulations for carrying a statute into effect must be exercised within the powers delegated, that is to say, must be confined to details for regulating the mode of proceeding to carry into effect the law as it has been enacted, and it cannot be extended to amending or adding to the requirements of the statute itself.' 12 C. J. 845, 846. But we have already seen that the question here involved is a detail in harmony with the fundamental idea of the legislators and with the purpose that that idea be a reality in practice."

There we went on to cite from *People* v. *Neagle,* 21 P.R.R. 339, 345, a civil case which in turn contained a quotation from

*United States* v. *Grimaud, supra,* reproduced in *People* v. *Ortiz, supra.*

Under the authorities we feel bound to hold that the Legislature could not delegate to the Department of Health the power to make a rule punishing as a crime the selling in general of goods falsely labeled. This is a crime in itself and not a mere administrative matter or the filling up of details.

This becomes more apparent when the question of a criminal intent is considered. The Legislature cannot let a rule-making body determine when and when not such an intent may be dispensed with as in the milk cases.

Moreover we do not think that the act of 1912 did so delegate the power to make the rule here promulgated. The Department of Health was given wide powers to protect the health of the community, to prevent the spreading of disease and other matters of public nature, but we discover no intention to give the said department the power to fix the duties here sought to be punished.

We are of the opinion that the Legislature could not itself pass a law making it the duty of a druggist to guarantee or insure every article he sold when he himself had no hand in the manufacture of the article sold, but merely received it from a commercial house ordinarily reliable. The real criminal responsibility then rests with the houses that have so manufactured or sold or transported in interstate commerce. While the prosecution may be more difficult, it is not impossible.

In Rule 53 as promulgated a reference is made to sections 7 and 8 of the National Food and Drugs Act. These sections are the definitions of when a drug should be considered adulterated or misbranded. If the national act of 1906 is examined it will be seen that in the territories only the manufacture is punished but not the sale in general of adulterated or misbranded articles. Congress did not, within the places under its jurisdiction, go so far as to attempt to punish the

sale of such adulterated or misbranded articles, nor as we read the acts has the Legislature of Puerto Rico.

The judgment should be reversed and the prisoner discharged.

The Chief Justice and Mr. Justice Hutchison concurred in the judgment.

Mr. Chief Justice Del Toro, concurring.

In view of the far-reaching effects of the conclusions reached in the opinion, which formed the basis for the reversal of the judgment appealed from and the discharge of the defendant, I feel bound to express my views separately.

I concur in the reversal, because I agree that "the Legislature could not delegate to the Department of Health the power to make a rule punishing as a crime the selling in general of goods falsely labeled. This is a crime in itself and not a mere administrative matter or the filling up of details." (Opinion of the Court delivered by Mr. Justice Wolf.)

But I can not agree that the Legislature would have no power to pass a law similar to the regulation, under which the defendant was convicted in the present case. If the view stated in the said opinion were to prevail, the National Food and Drugs Act, I think, would have to be declared unconstitutional.

The health of the people and the protection of the community require that the mere act of selling an adulterated food or drug should be regarded as a criminal offense, perhaps as the only effective means of preventing and punishing violations, similar to the one prosecuted in this case and which at times cause death among the citizens. It has been held that—

"The intent follows the act. The true construction of the Food and Drugs Act is that the dealer or manufacturer sells a commodity at his peril, and he is bound to understand the ingredients of the

product." *United States* v. *Hobart et al.*, Circuit Court, S. D. New York, November 15, 1910.

"An article of food or drug which is adulterated or misbranded is an offending thing which threatens the health of the citizen, and is therefore subject to seizure without regard to the acts or knowledge of the owners or claimants. The question of intent does not enter into the case." *United States* v. *Five Boxes of Asafoetida*, 181 Fed. 561.

"The Food and Drugs Act nowhere requires proof of intention by the use of the words 'knowingly,' 'willfully,' or such like words. It would be destructive of the act, nullify it entirely, to allow the intent of the maker to be considered as a defense." *United States* v. *36 Bottles of London Dry Gin.* 210 Fed. 272.

"Proof of the absence of knowledge on the dealer's part that the article is obnoxious to some of the provisions of the act is only a defense when the article is purchased from a manufacturer, and a guaranty taken from the manufacturer that it complies with the requirements of the act." *United States* v. *Mayfield et al.*, 177 Fed. 768. See "Federal Food and Drugs Act and Decisions," compiled by C. A. Gwinn, under the direction of the Solicitor General of the United States, Washington, 1914.

The latter decision points the way for those persons, who buy articles of this kind for resale which they are unable to inspect themselves.

I am authorized to state that Mr. Justice Hutchison concurs in this opinion.